[S. F. No. 6014. In Bank.—May 2, 1912.]

GEORGE PUTERBAUGH, Petitioner, v. JAMES E. WAD-
HAM et al., Respondents.

MANDAMUS—FUNCTIONS OF WRIT—PERFORMANCE OF DUTY IN PARTICU-
LAR MANNER.—The writ of *mandamus* is not a writ of error, and,
generally speaking, it is not available for the purpose of altering
or varying in any particular the finding of a judicial or. *quasi*
judicial body or officer acting within its or his appropriate juris-
diction; but where the facts are not disputed and the only matter
to be determined is the duty of the body or officer under the law,
the court will define such duty and enforce not only its performance
but the carrying out of the obligations of the body or officer in a
particular manner.

ID.—PAYMENT OF OFFICIAL SALARY—AUDITOR'S FUNCTION MINISTERIAL.
—*Mandamus* is the appropriate method of compelling the proper
officer to pay the salary of a public servant as fixed by law. In
such a case, the law being ascertained, the function of the auditor
is ministerial and it is his duty to order the payment of a lawful
claim, and he cannot avoid the application of mandate to compel
the performance of such duty by saying that in mistakenly acting
upon a claim he has exercised his discretion. The same doctrine
applies to the case of the allowance of a claim for official salary by
the auditing committee of the city of San Diego.

ID.—PROHIBITION AGAINST INCREASE OF SALARY DIRECTED TO LEGIS-
LATURE—CONSTITUTIONAL LAW.—PASSING OF CITY INTO HIGHER
CLASS BY INCREASE OF POPULATION.—Section 9 of article XI of the
constitution providing that "the compensation of any county, city,
town, or municipal officer shall not be increased after his election or
during his term of office; nor shall the term of any such officer be
extended beyond the period for which he is elected or appointed," is
an inhibition directed to the legislature, and has no application to
an automatic increase in official salary due to the passing of a city,
not by legislative act, but by increased population, from one class
to another.

ID.—CITY OF SAN DIEGO—CENSUS OF 1910—JUSTICE OF PEACE—SALARY
WHEN CITY PASSED INTO SECOND CLASS.—Under section 2 of the
act of 1883 for the classification of municipal corporations, (Stats.
1883, p. 24), the United States census taken in the year 1910, as of
the 15th of April of that year, operated, without action upon the
part of the legislature or of the people of the city of San Diego, to
place that municipal corporation, which had previously been a city
of the third class, in the second class as of April 15, 1910, and one
who had been elected a justice of the peace of that city, at a time
when the statute fixed the salary of a justice of the peace of a city
of the third class at two thousand dollars a year and of a city of

the second class at thirty-six hundred dollars a year, became entitled to the increased salary from April 15, 1910, to the end of his term of office at the end of that year.

ID.—ACCEPTANCE BY JUSTICE OF LESSER SALARY—WANT OF KNOWLEDGE OF CLASSIFICATION OF CITY.—ESTOPPEL.—The acceptance by such justice of the peace of the salary attached to the office in a city of the third class, after the 15th of April, 1910, but prior to the official promulgation of the census and without knowledge by him of the fact that the city of San Diego had passed into the second class, did not estop him from subsequently demanding the increased compensation.

ID.—INCREASE OF OFFICIAL SALARIES—CONSTITUTIONAL INHIBITION—LOWERING AND RAISING SALARY DURING TERM OF OFFICE.—The provision of section 9 of article XI of the constitution that the salary of any county, city, town, or municipal officer shall not be increased "during his term of office" has reference only to the compensation as fixed by law when his term of office began. The legislature has power, pending his term of office, to lower the compensation, and afterwards raise it, provided the subsequent raise is not in excess of the compensation fixed when the official term began.

ID.—JUSTICE OF PEACE OF SAN DIEGO—COMPENSATION AFTER 1911 UNDER VARIOUS LEGISLATIVE ENACTMENTS.—A justice of the peace of the city of San Diego, whose elective term commenced in January, 1911, when that city was classified as one of the second class, was entitled to a salary at the rate of thirty-six hundred dollars a year, until February 8th of that year, when by an amendment to the Classification Act (Stats. 1911, p. 11), he became a justice of the peace of a city of the third class. He then became entitled to compensation at the rate of two thousand dollars a year, until the amendment of March 24, 1911 (Stats. 1911, p. 476), which placed that city in the second and one-half class. From that date and until the re-enactment of section 103 of the Code of Civil Procedure on April 29, 1911, (Stats. 1911, p. 1215), there was no law providing any salary for a justice of the peace in a city of the second and one-half class, and during that interval the incumbent of the office had no right to a salary.

ID.—MANDAMUS FOR OFFICIAL SALARY — RECOUPMENT FOR OVERPAYMENTS.—In a proceeding in *mandamus* by such justice of the peace to compel the auditor and auditing committee of the city of San Diego to draw warrants for the balance of the salary due him, the city is entitled to recoupment for overpayments mistakenly made after February 8, 1911, upon the belief that the city was still one of the second class, and to have the amount of such overpayments deducted from the arrearages due the petitioner.

APPLICATION for a Writ of Mandate directed to the auditing committee and the city auditor of the city of San Diego.

The facts are stated in the opinion of the court.

George Puterbaugh, *in pro. per.,* for Petitioner.

W. R. Andrews, for Respondents.

MELVIN, J.—Petitioner, George Puterbaugh, justice of the peace of the city of San Diego, asks this court for a writ of mandate to compel the auditing committee and the city auditor of said city of San Diego to draw warrants for the payment of his salary. Respondents demur generally to the petition. They also file answers without waiving the demurrers, but these answers admit all essential matters of fact pleaded in the petition; therefore our conclusions upon the demurrers will suffice to settle the whole subject before the court. The demurrer is based upon the assertion that the auditing committee and the auditor having acted in a *quasi* judicial capacity in determining what salary petitioner is entitled to receive under the law, the court cannot by *mandamus* review or alter such action. It is undoubtedly true that the writ of *mandamus* is not a writ of error and that, generally speaking, it is not available for the purpose of altering or varying in any particular the finding of a judicial or *quasi* judicial body or officer acting within its or his appropriate jurisdiction; but where the facts are not disputed and the only matter to be determined is the duty of the body or officer under the law, the court will define such duty and enforce not only its performance but the carrying out of the obligations of the respondent body or officer in a particular manner. *Mandamus* is the appropriate method of compelling the proper officer to pay the salary of a public servant as fixed by law. In such a case the law being ascertained it is the auditor's duty to order the payment of a lawful claim. In such a case his function is ministerial and he cannot avoid the application of mandate to compel the performance of such duty by saying that in mistakenly acting upon a claim he has exercised his discretion. (*Fowler* v. *Peirce,* 2 Cal. 167.) The same doctrine applies in the present case to the auditing committee.

Petitioner was appointed July 7, 1909, to fill an unexpired term as justice of the peace of the city of San Diego. At the time of his appointment San Diego was a city of the third class and the salary of his office as then fixed by law was two

thousand dollars per annum. The charter of the city of San Diego makes no provision for the election or appointment of a justice of the peace and petitioner is the only judicial officer of that rank having jurisdiction in that city. From the time of his appointment to the end of his appointive term petitioner drew salary at the rate of two thousand dollars a year. In November, 1910, he was elected to the full term beginning on the first Monday in January, 1911. At the time of his election and when his elective term of office began the city of San Diego had passed by reason of its increased population, from the third to the second class and the city justice of a city of that class was entitled to a salary of thirty-six hundred dollars per annum, payable in equal monthly installments (Code Civ. Proc., sec. 103). At the end of January, 1911, he demanded three hundred dollars as his salary for that month. The auditing committee allowed his claim for $166.66 without prejudice, and later upon advice of the city attorney of San Diego commanded that a further warrant of $133.33 be drawn. For the months of February, March, April, May, and June, 1911, he presented his claims for three hundred dollars per month and they were duly audited and paid. On July 31, 1911, his verified claim for three hundred dollars as his salary for the month of July, went to the auditing committee and on August 2, 1911, said committee allowed the claim and ordered its payment. Before a warrant for the July salary had been drawn, however, the city attorney of San Diego received a copy of the laws enacted by the legislature of 1911, and discovered that on February 8th of that year an act had been approved by which cities were re-classified in such manner that San Diego again became a city of the third class; that on March 24, 1911, municipal corporations were again classified with the result that San Diego passed into the second and one-half class, and that following the adoption of this latest classification section 103 of the Code of Civil Procedure had also been amended by an act approved April 29, 1911 [Stats. 1911, p. 1215], and the salary of a justice of the peace in a city of the second and one-half class had been fixed at three thousand dollars per annum. He thereupon advised the auditor that the justice of the peace had been overpaid at the rate of $133.33 a month from February 8th to June 30th, 1911; that the latest reclassification of cities and the amendment to section 103 of the Code of Civil

Procedure fixing the salary of a justice of the peace in cities of the second and one-half class at three thousand dollars a year could not operate in favor of petitioner Puterbaugh because it would be an increase of his compensation during his term of office in violation of section 9 of article XI of the constitution of California; and that the amounts paid to said Puterbaugh in excess of the sums found due by a computation based upon this interpretation of the law must be either repaid to the city by him or earned at the rate of $166.66 a month before any warrant might be drawn in his favor, because under section 2 of chapter 2 of article VI of the charter of the city of San Diego no demand upon its treasury may be allowed by the auditing committee or by any officer of the municipality in favor of one indebted to the city without first deducting the amount of such indebtedness. Acting upon this advice the auditor refused to approve petitioner's warrant for July although the auditing committee of the city had allowed his demand .for three hundred dollars. The auditor estimated that from January 1, 1911, to February 8, 1911 (the date of the first reclassification of cities) petitioner had earned at the rate of thirty-six hundred dollars per annum three hundred and eighty dollars; that from the last mentioned date to July 31, 1911, at the rate of two thousand dollars per annum he had earned $955.52, or $1335.52 in the aggregate; but that having been paid eighteen hundred dollars for the first six months of the year 1911, the justice of the peace was indebted to the city in the sum of $464.48 on August 1, 1911. To phrase it differently, the auditor estimated that on November 1, 1911, this petitioner would be entitled to a warrant for $35.51.

Following the auditor's refusal to audit his claim, petitioner demanded additional salary for that part of the year 1910, following the change in the classification of San Diego whereby it entered the third class. Under the twentieth section of the act providing for the taking of the census of the United States for the year 1910 it was specified that such census should be taken as of April 15, 1910, and by the official promulgation of the detailed figures of the census on or about March 22, 1911, it appeared that the population of San Diego was 39,578, which, according to the statute in force then and up to February 8, 1911, made it a city of the second class. Petitioner had been paid $166.66 for each month of the year

1910, but he claimed compensation at the rate of three hundred dollars a month after April 15th of that year, or an additional sum of $133.33 a month for eight and one-half months, or $1133.33. The auditing committee rejected this claim upon the ground, as shown by their answer and in the brief of the city attorney, that by accepting two thousand dollars in full payment of his services for the year 1910, petitioner is estopped from demanding an additional sum, as well as upon the theory that the increased payment demanded would be in contravention of section 9 of article XI of the constitution. Petitioner insists that a city justice of the peace holding office by virtue of general laws is not a city, county, nor township officer and is therefore not one of those contemplated by section 9 of article XI of the constitution, whose salaries may not be increased. Such justices of the peace have been repeatedly mentioned as "part of the constitutional judicial system of the state" (*Graham* v. *Mayor and Board of Trustees of the City of Fresno,* 151 Cal: 471, [91 Pac. 147]; *People* v. *Cobb,* 133 Cal. 76, [65 Pac. 325]; *People* v. *Sands,* 102 Cal. 17, [36 Pac. 404]; *Kahn* v. *Sutro,* 114 Cal. 331, [33 L. R. A. 620, 46 Pac. 87]; *In re Johnson,* 6 Cal. App. 740, [93 Pac. 199]) and the petitioner argues most forcibly that the constitutional inhibition cannot apply to those who do not come strictly within the classification of county, city, town, or municipal officers. We need not decide this interesting question, however, because, assuming that the said constitutional provision does apply to the case before us there is no difficulty in determining the respective rights of petitioner and the city. Section 9 of article XI is an inhibition directed to the legislature because it applies not only to attempted increases of salaries but to efforts to extend terms of office. The latter part of the section is unquestionably a limitation upon legislative power and the former from its association should be similarly construed. We think the section could have no application to the change in salary due to the passing of a city, not by legislative act, but by increased population, from one class to another—not a legislative but an automatic change. When petitioner was elected justice of the peace the statute established his salary at two thousand dollars a year because of the population of San Diego, but the same statute fixed the salary of a justice of the peace in a city of the second class, and the evolution of the city into that class

did not increase his salary as such—it merely placed him in a new class in which he was entitled to a certain salary which happened to be in excess of that payable to him when he took the office. The possibility of a change in his *status* when the city should grow into another class must have been in the contemplation of the officer and of the people who elected him. That this change would operate to increase his salary must also have been within their contemplation, and section 9 of article XI of the constitution, which was designed to protect taxpayers from legislative interference with their rights by increasing the compensation paid to their elected officers without consent of the electorate would have no application to such a case as this. If, then, the taking of the census of 1910 operated without action upon the part of the legislature or the people of the city of San Diego to place that municipal corporation in the second class as of April 15, 1910, the petitioner is entitled to salary as a justice of the peace of a city of that class from April 15th to the end of the year 1910, unless estopped from demanding such increased compensation by his acceptance of two thousand dollars in equal monthly installments for his services during the year 1910. The act of Congress authorizing the taking of the census in the year 1910 provides that such census shall be taken as of April 15th of that year. (36 Stats. at Large, p. 7, [U. S. Comp. Stats. 1911, p. 557].) Section 2 of the act of 1883 for the classification of municipal corporations (Stats. 1883, p. 24) provided: "The census taken under the direction of the congress of the United States . . . shall be the basis upon which the respective populations of said municipal corporations shall be determined, . . ." This section has not been changed by subsequent amendments of the statute. (Stats. 1901, p. 94; Stats. 1911, pp. 11 and 476.) We think that for the purpose of determining the amount of salary to be paid to petitioner the city of San Diego passed without formal action of any sort into the second class (Stats. 1901, p. 94) as of April 15, 1910, and he thereby became entitled to three hundred dollars a month (Code Civ. Proc., sec. 103). This conclusion, it seems to us, follows inevitably from the doctrine of *Ex parte Fedderwitz,* (Cal.) 62 Pac. 939. In the opinion of the chief justice in that proceeding, discussing the Mitchell case (120 Cal. 384, [52 Pac. 799]), he said: "The question discussed in that

case in both the principal and concurring opinions was whether the police court of Los Angeles had ceased to exist the moment it was ascertained by a special enumeration that the population of the city exceeded 100,000, and all that was decided was that changes of municipal organization do not take place automatically in consequence of changes of population which remove cities from one class to another. This is quite in consonance with the provisions of the Classification Act. A city of the fourth class, retains its charter notwithstanding an increase of population which puts it in the third class. But it does not follow that because its charter remains unchanged its class remains unchanged. On the contrary, the privilege of changing its charter depends upon a change of class. The charter has nothing to do with fixing its class. That is dependent upon population alone, which is an element of all cities, however organized. In organizing under the general law a city must accept the charter of its proper class, but, unless it elects otherwise, it retains its original charter, no matter to what class it may rise or fall by change of population. This is the whole effect of the decision in *In re Mitchell*, and it does not conflict with the proposition that Berkeley, like every other city of California, becomes at once, within the meaning of our statute law, a city of the class to which its legally ascertained population assigns it."

In *People* v. *Wong Wang*, 92 Cal. 280, [28 Pac. 271], it was held that, "The exclusive jurisdiction of the police court over certain public offenses committed in a city having thirty thousand and under one hundred thousand inhabitants depends upon the fact of its having the specified number of inhabitants, and not upon any report or proclamation of the fact," so the right of Judge Puterbaugh to draw salary as a justice of the peace of a city of the second class depended not upon the *proclamation* but upon the *fact* that on April 15, 1910, the population of San Diego was ascertained by the federal authorities to be 39,578. There was no estoppel by his acceptance of the former salary of two thousand dollars a year because the facts were not known to him until after the official promulgation of the census. There can be no estoppel where the facts are not known. (*Wheaton* v. *North British & Mer. Ins. Co.*, 76 Cal. 429, [9 Am. St. Rep. 216, 18 Pac. 758].) It is therefore the duty of the auditor to certify the petitioner's

claim for additional salary from April 15, 1910, to the end of that year at the rate of thirty-six hundred dollars a year.

When petitioner commenced his elective term in January, 1911, he was a justice of the peace of a city of the second class and was entitled to a salary of thirty-six hundred dollars a year. This, we believe, is conceded by the attorney for the city and was admitted by the auditing committee and the auditor when they allowed petitioner's salary of three hundred dollars for the month of January. Conceding, without deciding, that section 9 of article XI of the constitution is applicable, the subsequent changes in his salary brought about by the legislature during the session of 1911 would not be in violation of that section, because none of them raised his compensation above thirty-six hundred dollars per year. The salary of an officer which may not be increased "during his term of office" has reference only to his compensation as fixed by law when his term of office began. That the first reduction was to two thousand dollars a year and that the salary eventually became three thousand dollars a year is immaterial. The former enactment did not bar the latter nor render it inoperative. The very purpose of the constitutional provision, as we have indicated above was to prevent the legislature from adding to the rate of salary payable to a public officer at the time of his induction into office, and the prohibition of the constitution would not apply to legislative adjustments at rates less than that to which he was entitled at the beginning of his term. Petitioner's right to salary at the rate of thirty-six hundred dollars a year existed from the first Monday in January to February 8th of that year when by an amendment to the Classification Act he became a justice of the peace of a city of the third class (Stats. 1911, p. 11). Under this re-classification and under section 103 of the Code of Civil Procedure as it then existed, he was entitled thereafter to compensation at the rate of two thousand dollars a year until the subsequent amendment which placed San Diego in the second and one-half class, and became a law March 24, 1911 (Stats. 1911, p. 476). Section 103 of the Code of Civil Procedure did not then provide for any salary in the second and one-half class and we must conclude that petitioner was without right to salary after March 24, 1911, until the re-enactment of section 103 of the Code of Civil Procedure, April 29, 1911

(Stats. 1911, p. 1215) when the salary of a justice of the peace of a city of the second and one-half class was fixed at three thousand dollars per annum.

It remains only to consider the auditor's claim that the city is entitled to recoupment for the overpayments mistakenly made after February 8th to July 1st upon the belief of the auditor and the auditing committee that San Diego was still a city of the second class. In our opinion these cannot be deemed such voluntary payments as prevent the city from enforcing its demands in an action like the present. The auditing committee is prohibited from allowing any demand upon the treasury in favor of any officer *"in any manner* indebted to the city." While this indebtedness has not been fixed by any judgment, it is easily ascertainable under the admitted facts of this case, and the auditing committee should not be compelled by mandate to allow any claim which does not recognize such indebtedness.

From the above discussion it follows that the demurrers to the petition herein are overruled and upon the facts alleged in said petition which are either directly admitted or not denied, it is ordered that *mandamus* issue to respondents that they audit and allow petitioner's claim for compensation at the rate of $133.33 a month from April 15, 1910, to January 2, 1911; $300.00 a month from January 2 to February 8, 1911; $166.66 a month from February 8 to March 24, 1911 and $250 a month from April 29, 1911 to October 1, 1911 (or to the last full month prior to the filing of the petition herein) ; subtracting from the aggregate of all such sums, however, the amounts in excess of petitioner's salary (according to the views above expressed)', which were paid to petitioner during the months of February to June, 1911, inclusive.

Shaw, J., Sloss, J., Angellotti, J., and Lorigan, J., concurred.